**VECO INTERNATIONAL, INC., and its Subsidiaries, Appellants,**

**v.**

**The ALASKA PUBLIC OFFICES COMMISSION, Appellee.**

No. S–1598.

Supreme Court of Alaska.

April 1, 1988.

Sema E. Lederman, Clifford J. Groh, Lance E. Gidcumb, Groh, Eggers & Price, Anchorage, for appellants.

Richard D. Monkman, Asst. Atty. Gen., Juneau, Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

Under the Alaska Campaign Disclosure Act, every group as defined in AS 15.13.-130(4)[1] must register with the Alaska Public Offices Commission[2] before making a

---

**1.** AS 15.13.130(4) provides:

"group" means every state and regional executive committee of a political party and, in addition, means any combination of two or more persons or individuals acting jointly who take action the major purpose of which is to influence the outcome of an election; a group that makes expenditures or receives contributions with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate shall be considered to be controlled by that candidate; a group whose major purpose is to further the nomination, election, or candidacy of only one person, or intends to expend more than 50 per cent of its money on a single candidate, shall be considered to be controlled by that candidate and its actions done with his knowledge or consent unless, within 10 days from the date the candidate learns of the existence of the group he files with the commission, on a form provided by the commission, an affidavit that the group is operating without his control; a group organized for more than one year preceding an election and endorsing candidates for more than one office or more than one political party is presumed not to be controlled by a candidate; however, a group that contributes more than 50 per cent of its money to or on behalf of one candidate shall be considered to support only one candidate for purposes of AS 15.13.070, whether or not control of the group has been disclaimed by the candidate;

**2.** AS 15.13.050 provides:

Each group, before making an expenditure on behalf of, or in opposition to, a candidate or a contribution to a candidate, shall register, on forms provided by the commission, with the commission. If the group intends to support or oppose only one candidate, or to contribute to or expend on behalf of, or in opposition to, one candidate 50 percent or more of its funds, the name of the candidate shall be a part of

contribution to a candidate, and must file periodic reports concerning, among other things, its contributions.[3] The Alaska Public Offices Commission found that appellants VECO International, VECO, Inc., and Norcon, Inc.[4] had formed groups with their respective employees which had made contributions to candidates and had not complied with the reporting requirements of AS 15.13.040. The Commission imposed a

civil penalty under AS 15.13.125 of $72,-600.[5] VECO appealed the decision of the Commission to the superior court, which affirmed the Commission. VECO now appeals to this court.

VECO raised money and made contributions in the following way. It encouraged its employees to authorize $100 to be withheld from their paychecks. The money

---

the name of the group. Promptly upon receiving the registration, the commission shall notify the candidate of the group's organization and intent.

3. AS 15.13.040(b), (c), (d), and (e) provide:

(b) Each group shall make a full report upon a form prescribed by the commission, listing

(1) the name and address of each officer and director;

(2) the aggregate amount of all contributions made to it; and, for all contributions in excess of $100 in the aggregate a year, the name, address, principal occupation, and employer of the contributor, and the date and amount contributed by each contributor; and

(3) the date and amount of all contributions made by it and all expenditures made, incurred or authorized by it.

(c) The report required under (b) of this section shall be filed in accordance with AS 15.13.110 and shall be certified as correct by the group's treasurer.

(d) Every individual, person or group making a contribution or expenditure shall make a full report, upon a form prescribed by the commission, of the following contributions or expenditures:

(1) any contribution of cash, goods or services valued at more than $100 a year to any group or candidate; or

(2) any expenditure whatsoever for advertising in newspapers, on radio or on television; or, for the publication, distribution or circulation of brochures, flyers, or other campaign material for any candidate or ballot proposition in question.

(e) The report required under (d) of this section shall contain the name, address, principal occupation and employer of the individual filing the report, and an itemized list of expenditures. The report shall be filed with the commission by the contributor no later than 10 days after the contribution or expenditure is made. A copy of the report shall be furnished to the candidate, campaign treasurer or deputy campaign treasurer at the time the contribution is made.

AS 15.13.110 provides:

(a) Each candidate and group shall make a full report in accordance with AS 15.13.040 during the period ending three days before the due date of the report and beginning on the last day covered by the most recent previous report, or, if a first report, all contributions received and expenditures made before three days before the due date of the report. The report shall be filed at the following times:

(1) 30 days before the election; however, this report is not required if the deadline for filing a nominating petition or declaration of candidacy is within 30 days of the election;

(2) one week before the election;

(3) ten days after the election; and

(4) December 31 of each year for expenditures and contributions received which were not reported that year.

(b) Each contribution or expenditure which exceeds $250 which is made within one week of the election shall be reported to the commission by date, amount, and contributor or recipient within 24 hours of receipt or expenditure by the candidate or campaign treasurer.

(c) The reports of candidates shall be filed with the commission's central office. All reports required by this chapter shall be kept open to public inspection. Within 30 days after each election, the commission shall prepare a summary of each report which shall be made available to the public at cost upon request. Each summary shall use uniform categories of reporting.

(d) Within 30 days after each election, each supplier shall make a full report to the commission in accordance with AS 15.13.040. Within 60 days after each election, the commission shall prepare a summary by candidate or group of the transactions and make the summaries public.

(e) A group formed to sponsor an initiative, a referendum or a recall shall report 30 days after its first filing with the lieutenant governor. Thereafter each group shall report within 10 days after the end of each calendar quarter on the contributions received and expenditures made during the preceding calendar quarter until reports are due under (a) of this section.

4. VECO, Inc. and Norcon, Inc. are subsidiaries of VECO International. They will hereafter collectively be referred to as VECO.

5. *See* discussion of penalty calculation *infra* pp. 715–716.

would be paid to a candidate chosen by the Alaska Political Action Committee which was controlled by Bill Allen, chairman of VECO, and a colleague. Each of the VECO corporations was a member of the Political Action Committee. Each employee had the right to select a donee other than candidates chosen by the Committee within fifteen days after receiving notice of the Committee's choice.[6]

By mid–December of 1983, VECO had accumulated $41,080 from employee payroll deductions. VECO informed its contributing employees that the candidates recommended by the Political Action Committee were Senators Bennett, Eliason, Faiks, Fischer, and Moss. Each employee received a notice from VECO stating, in part:

> Unless you notify APAC c/o Bob Ely, VECO International ... that you do not wish to contribute to one or more of the above Alaska State Senators, your contribution and those of the other employees who have contributed will be allocated to one or more of the above supporters of a reasonable tax policy for the State of Alaska.

Of the 415 employees who had consented to the payroll deduction, one instructed VECO that his contributions should go to only one of the five recommended candidates, three others withdrew from the plan entirely, and two directed VECO to disburse no part of their contributions to one of the recommended candidates. It appears the others did not respond to the notice. Thereafter, the money was divided up in five nearly equal shares of approximately $7,700 and one share was distribut-

ed to each of the five candidates in a series of $100 checks.

Ten points on appeal are presented:

1. The superior court erred in giving retroactive effect to the Commission's regulations.

2. VECO did not form a group with its employees as defined by AS 15.13.130(4).[7]

3. The Commission is estopped from finding that the VECO withholding plan constituted group activity.

4. The Alaska Campaign Disclosure Act is unconstitutionally overbroad.

5. The Act is unconstitutionally vague.

6. The Act violates the right to privacy.

7. The Commission abused its discretion in failing to give VECO notice of delinquency.

8. The Commission erred in failing to make findings or state reasons regarding the penalties it assessed.

9. The penalties assessed are excessive.

10. The accrual of penalties during appeal is unconstitutional.

We hold that a partial estoppel should apply and that a statement of reasons regarding penalties should have been given. We also hold that the accrual of penalties during the administrative appeal was improper. The other points are rejected.

### Point 1. *Retroactive Effect of Regulations*

■ VECO makes two contentions concerning this point. First, it complains that the superior court relied on a regulation, 2 AAC 50.314(a)(1) (eff. 1/4/86),[8] defining the

---

**6.** The authorization for payroll deduction states:
> I hereby authorize the deduction of One Hundred Dollars ($100) from my next paycheck. The withheld money should be paid according to the recommendation of the Alaska Political Action Committee unless within fifteen days after receiving the Committee's recommendation I revoke this authorization. I understand that you will provide me with evidence of who received my contributions and in what amount so that I can use this information to take the tax credit off my Federal Income taxes. Also I will use this information to apply for the $100 maximum political contribution refund from the State of Alaska provided I qualify as an Alaska resident and

provided that the legislature appropriates funds for paying the refunds.

Employee I.D.____
Date: ____

**7.** The Commission's conclusion that three groups rather than one was formed is not challenged on appeal. We express no view concerning the correctness of this point.

**8.** 2 AAC 50.314(a)(1) states:
> (a) In 2 AAC 50.310—2 AAC 50.405, "group" includes
> (1) every combination of two or more persons who are elected, appointed, or otherwise chosen, or who cooperate for the purpose of

word "group," which was not in effect until after the case was decided by the Commission. VECO argues that this amounts to an unconstitutional *ex post facto* law application. Second, VECO argues that the post decision repeal of a regulation which required the reporting of any informal gathering of twenty-five or more people in a private home, 2 AAC 50.325(f)(4) (repealed 1/4/86), should not have been considered by the superior court to moot VECO's argument that the Act violates the right to privacy.

These arguments reflect a misunderstanding of the standard of review which we employ in reviewing administrative appeals. "On appeal from an administrative appeal to the superior court we review the merits of the administrative determination directly, except to the extent that supplemental evidentiary proceedings have taken place in the superior court." *Oceanview Homeowners Ass'n v. Quadrant Constr. & Eng'g,* 680 P.2d 793, 798–99 (Alaska 1984); *Dresser Industries, Inc./Atlas Div. v. Hiestand,* 702 P.2d 244, 246 n. 3 (Alaska 1985); *National Bank of Alaska v. State, Dep't of Revenue,* 642 P.2d 811, 816 (Alaska 1982). What VECO must demonstrate is error on the part of the Commission, not the superior court. These arguments do not speak to Commission error and thus do not require review.

Point 2. *Was A Group Formed Between the Employer and Participating Employees?*

■ Alaska Statute 15.13.130(4)[9] provides that a group is "any combination of two or more persons ... acting jointly who take action the major purpose of which is to influence the outcome of an election...." The Commission held that each of the three VECO employer corporations constituted a separate group with their respective contributing employees. Under the Act, a corporation is a person. AS 15.13.130(7), AS 01.10.060(8). The Commission noted that "two or more persons or

individuals were involved in each plan" and that "the major purpose of each payroll deduction plan was to influence the outcome of an election." The combination and purpose requirements of the statutory definition having been satisfied, the issue that remained was whether joint action existed.

The Commission found joint action because "the employers actively participated in determining which candidates would receive the pool of funds from their employees." Absent the employers' role in recipient selection, the Commission indicated that the joint action requirement would not be fulfilled:

> The Alaska Public Offices Commission staff has taken the position that a withholding plan does not constitute joint action when the employee names a specific candidate, or candidates, to receive the withheld money. With this position, the Commission agrees. Under such circumstances, the employer is a mere conduit and has played no active part in the plan other than to mechanically obey the directions of its employees.

■ VECO argues that "a proper interpretation of joint action would require an employer to decide which candidates received employee contributions and to force recalcitrant employees to contribute. There was no evidence that VECO took such joint action." We agree with the Commission's position. Joint action in a payroll withholding contribution plan does not require mandatory participation by all employees, nor an absolute right of selection on the part of the employer. When two people or entities act jointly, they cooperate or collaborate. One need not control the other. In this context, joint action exists if the employer has a significant role in candidate selection.

It is clear VECO had such a role. VECO distributed authorization forms which ensured, as a practical matter, that the great bulk of the contributions would go to candidates selected by the Alaska Political Ac-

---

raising, soliciting, collecting, or disbursing money or anything of value, or for directing or controlling those activities to secure or defeat the election to public office of an indi-

vidual or candidate or to secure or defeat a ballot proposition.

9. *See* footnote 1, *supra.*

tion Committee. In itself that would be sufficient employer involvement for joint action. There was, however, more, as each of the corporations was a member of the Committee, and the Committee was co-founded and controlled by Bill Allen, VECO's chairman.

### Point 3. *Should the Commission be Estopped?*

In August of 1983, Bill Allen and Ed Dankworth, a VECO consultant and lobbyist, met with Theda Pittman, Executive Director of the Commission. The meeting was recorded. Allen and Dankworth said they were considering a payroll withholding plan and they wanted to know whether it would be exempt from the Act's reporting requirements. Pittman was asked whether VECO could bring a candidate to one of its oilfield camps and encourage employees to contribute to the candidate's campaign by authorizing a payroll deduction. Pittman indicated that such activity would be exempt.[10] Pittman knew that the opinions that she expressed were likely to be relied upon.

On December 16th, Robert Ely, counsel for VECO, delivered various documents to Pittman, including the authorization for payroll deduction. Pittman agreed to have them reviewed to determine whether the reporting requirements of the Act applied to the plan which the documents depicted.

Pittman, on behalf of the Commission, wrote two letters in response to this request. The first, delivered February 9, 1984, indicated that if employees specified the candidate recipient, "rather than granting APAC any discretion in that transaction," the transaction was exempt. Similarly, the second letter, dated February 16, 1984, stated:

> if the recipient of the withheld funds is not specified by the employee, then a group would have been formed under AS 15.13 with the employer as the administrator/treasurer. It seems plain to me that the employer cannot first get authority only to withhold pay and later go back for permission to give the funds to particular candidates or political groups.

■ The general elements of estoppel are (1) the assertion of a position by conduct or word, (2) reasonable reliance by another on the assertion, and (3) resulting prejudice. *Jamison v. Consolidated Utilities*, 576 P.2d 97, 102 (Alaska 1978). Even if these requirements are present, an estoppel against the government will not be invoked if the public interest would be significantly prejudiced. *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984).

VECO argues that the Commission should be estopped from finding that each employer corporation and its contributing employees constituted a group. It argues that it reasonably relied on Pittman's statement at the August 11, 1983 meeting that it was not group activity for an employer to encourage employees to contribute to a particular political candidate.

---

**10.** The recorded colloquy was as follows:

DANKWORTH: If Bill went to his 700 employees up in Camp. This gets into a real important area because we intend to do that. Let's say Bill went up and took Don Bennett with him during a campaign and Bill says fellows here's the candidate that I have contributed and I think he is going to be good to the industry. I'd like for you to listen to what he's got to say. Any contributions you make to him are voluntary and there is not any condition to your job or anything. Make clear that there's no pressure on your job—maybe you can even put pressure—I don't know—but technically, he goes up and says this is good for the boys and I'd like for you to hear what he's got to say and if you could, I'd appreciate your giving him something. If you want to—because they don't carry cash around like they do down here—you can sign and says I voluntary agree that $100 can be taken out of my paycheck and paid out to Don Bennett. Any problem with that if Don goes and makes his spiel and as long as its not a condition of employment?

THEDA PITTMAN: No I think not—I have seen paycheck stubs where the employer does the kind of thing that you are talking about for a variety of things, one of which was raffle tickets for a political campaign, but it was I mean there is just no question about that it was exactly as you described. The individuals decided whether or not to and how much to and that mechanism of the employer doing that transmittal was well documented—that it was simply that kind of transmittal.

The state counters that the August meeting was brief and Pittman's response was informal and vague. Thus, reliance on her response could not be regarded as reasonable.

■ In our view, Pittman's opinion expressed during the August meeting could reasonably have been relied on by VECO in crafting its employee withholding plan. Dankworth stressed the importance of his question, and Pittman's answer, though informal, was clear. The means of employer participation in the selection of the recipient of the employee's funds was different in the question on which Pittman commented than in the actual plan. However, significant employer participation in the selection of the recipient was present in both the question and the actual plan. Such participation was, if anything, greater in the hypothetical plan. Further, no regulations or Commission decisions then existed which would cast doubt on either the substance or the form of Pittman's opinion, or the extent to which VECO could rely on it.[11]

The period during which VECO could reasonably rely on Pittman's answer terminated with her letters of February, 1984. These clearly indicated that what VECO had done was group activity, because the Political Action Committee, rather than the employee, selected the recipient.

VECO's first reports were due January 16, 1984. The next were not due until thirty days before the August 1984 primary election. AS 15.13.120(a)(1). VECO's reasonable reliance thus served to excuse only the late filing of the first reports and as to them it served only for the time reasonably needed to prepare and file the reports after receiving Pittman's February letters.

VECO argues that its reliance on Pittman's August, 1983 statement excuses it from ever filing any reports relating to the payroll withholding plan. This assumes that the prejudice which VECO suffered is inherent in the obligation to report, rather than in the penalties which were imposed because of not reporting. We disagree. The reporting requirements imposed by the Act on groups are not particularly burdensome and neither VECO nor its employees have demonstrated a protected interest in the confidentiality of their political contributions.[12] Thus, VECO in reliance on Pittman's answer suffered legally cognizable prejudice only by being fined for late filing of the first reports. It did not, as in some other government estoppel cases, take action which could not be remedied at all or without great expense.[13]

### Point 4. *Overbreadth*

■ The right to act in concert with others for political purposes is protected by the first amendment to the United States Constitution and by the free speech provision of the Alaska Constitution[14], article I, section 5.[15] The Supreme Court has said:

[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process. The 19th century Committees of Correspondents and the pamphleteers were early examples of this phenomena and the Federalist Papers were perhaps the most significant and lasting example. The tradition of volunteer committees for collective action has manifested itself in myriad community and public activities; in the political process it can focus on a candidate or

---

11. Subsequent to the facts which gave rise to this case the Commission adopted a rule concerning advisory opinions which specifies the circumstances in which they will be issued and the extent to which they can be relied on. 2 AAC 50.905 (eff. 1/4/86). No similar rule was in effect in 1983 or 1984.

12. *Cf. Messerli v. State,* 626 P.2d 81 (Alaska 1981).

13. *Cf. Municipality of Anchorage v. Schneider,* 685 P.2d 94, 97 (Alaska 1984) (owner constructed building in conformity with building permit mistakenly issued by Municipality); *Fields v. Kodiak City Council,* 628 P.2d 927 (Alaska 1981).

14. *Vogler v. Miller,* 651 P.2d 1, 3 (Alaska 1982).

15. Alaska Constitution article I, section 5 provides: "Freedom of speech. Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

on a ballot measure. Its value is that by collective effort individuals can make their views known, when, individually, their voices would be faint or lost.

. . . .

The Court has acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues:

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association" . . . .

"The first amendment protects political association as well as political expression"

*Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, California,* 454 U.S. 290, 294–95, 102 S.Ct. 434, 436–37, 70 L.Ed.2d 492, 497–98 (1981) (citations omitted).

■ Restrictions on the right to associate in pursuit of political beliefs are permissible only where the government is able to show that the restrictions are justified by compelling governmental interests. *Vogler v. Miller,* 651 P.2d 1, 5 (Alaska 1982). Further, the restrictions must be no broader than needed to accomplish the governmental interests which justify them. *Id.*

Under the Alaska Campaign Disclosure Act, "[e]ach group before making an expenditure" must register with the Commission and file the name and address of its treasurer. AS 15.13.050, 060. In addition, each group must report periodically the name and address of each officer and director, the aggregate amount of all contributions made to it, the date and amount of all contributions made by it, and all expenditures which it has made. AS 15.13.-040(b).[16]

In *Messerli v. State,* 626 P.2d 81 (Alaska 1981), we reviewed the reporting requirements of the Act. Messerli, acting individually, had sponsored newspaper advertisements designed to influence certain ballot propositions in a municipal election. He did not file a report as required by AS

15.13.040(d), and was prosecuted for violation of the Act. He moved to dismiss the prosecution on constitutional speech and privacy grounds. From the denial of this motion in the trial court we accepted review. We noted that the statutory disclosure requirements placed a burden on one's right of expression to the extent that some people might be unwilling to publish their views if they were required to identify themselves. *Id.* at 86. We held, however, that this burden was in general outweighed by the need for an informed electorate:

Proper evaluation of the arguments made on either side can often be assisted by knowing who is backing each position. We have long recognized in court proceedings the importance of revealing to the decision maker the biases and motives of witnesses. Such information is no less important to an intelligent evaluation of what is being said during an election campaign. Similarly, a ballot issue is often of great importance financially to its proponents or opponents, or both, and multimillion dollar advertising campaigns have been waged. In such circumstances the voter may wish to cast his ballot in accordance with his approval or disapproval of the sources of financial support.

*Id.* at 87 (footnotes omitted). However, in cases where individuals had a special need for anonymity, as where they might be subject to reprisals for publicizing their views, we held that the disclosure requirements could not be constitutionally applied. We directed the commission to adopt regulations establishing criteria for the identification of circumstances under which anonymity was required and remanded for a determination as to whether Messerli had a special need for anonymity.

There exist two other compelling grounds for the disclosure of information in political campaigns. These are the deterrence of corruption and the detection of violations of contribution limitations:

**16.** Contributions made to each group in excess of $100 must be itemized and information con-

cerning the contributor must be set forth.

[D]isclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post election special favors that may be given in return....

[N]ot least significant, record keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations....

*Buckley v. Valeo*, 424 U.S. 1, 67–68, 96 S.Ct. 612, 658, 46 L.Ed.2d 659, 715 (1976), *quoted in Messerli*, 626 P.2d at 85.

VECO does not claim that any disclosure requirement is per se invalid, or even that the requirements are invalid as applied in this case. Rather, the claim is that the requirements are overbroad; some applications of the Act would unjustifiably infringe on protected activities. Under such a claim, it is irrelevant that the claimant's activities themselves are not protected.[17]

VECO claims that the Act imposes disclosure requirements on small groups that spend minor sums of money or even no money at all. It argues that the very existence of the requirements will chill the speech and associational rights of small groups which lack the knowledge or the initiative to comply. Furthermore, VECO argues that inclusion of such groups can-

not be justified by compelling state interests.

■ As for groups that spend *no* money and receive *no* contributions, the state responds that the Act does not require them to register. We agree. The obligation to register under section .050 does not ripen until each group intends to make a contribution or expenditure.[18]

The Act does apply to groups that receive small contributions and make small expenditures but its application is justified, according to the state, by the objective of achieving an informed electorate and monitoring compliance with the $1,000 contribution limit and other legal requirements.[19]

Concerning the goal of an informed electorate, the state argues:

Disclosure informs voters about the sources of campaign funds. This information is critical to "place each candidate in the political spectrum more precisely than is often possible on the basis of party labels and campaign speeches," and to "alert the voter to the interests to which a candidate is not likely to be responsive and thus facilitate predictions of future performance in office."

Disclosure of even a "token contribution" can provide the electorate with valuable information concerning the political position of a candidate.

Concerning accurate accounting, the state argues:

Accurate accounting starts at the outset. A group's first contribution may be "minimal" but a series of "minimal" contributions can quickly add up to "major"

---

**17.** This rule of expanded standing is unique to challenges under the first amendment and is applied because of the importance our society gives to the principles of free speech. *Gottschalk v. State*, 575 P.2d 289, 290 n. 2 (Alaska 1978); *Marks v. City of Anchorage*, 500 P.2d 644, 656 n. 7 (Alaska 1972). Standing is expanded because of the fear that an overbroad statute will "chill" conduct which is protected by the first amendment. *See generally* L. Tribe, *American Constitutional Law* 720 (1978).

**18.** This interpretation is not inconsistent with the Commission regulation which requires a short form disclosure "[i]n the absence of any contribution or expenditure activity whatsoever

during the reporting period." 2 AAC 50.332(a) (eff. 5/14/80). The obligation to register with the Commission and to report must be triggered by contribution or expenditure activity. The regulation only speaks to periods after the triggering event has occurred.

**19.** The $1,000 contribution limit is set forth in AS 15.13.070(a). In addition, the state notes that accurate record keeping serves the goal of determining whether a candidate has fully reported contributions as required by AS 15.13.-040 and the goal of determining whether a candidate has violated the ban on expenditures prior to filing a declaration of candidacy. AS 15.13.100.

contributions. If proper records are not kept, the group can easily lose track of where its money has come from and where the money has gone.

■ Analytically, there are two ways a statute could be overbroad, which might loosely be termed "systemic" and "local." An overbroad statute is *systematically* overbroad if there is "no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits." *Maryland v. J.H. Munson Co.*, 467 U.S. 947, 965–66, 104 S.Ct. 2839, 2852, 81 L.Ed.2d 786, 801–02 (1984). The separation of powers decreed by the state constitution requires that this court strike such a statute in its entirety, rather than re-draft it. *See* Alaska Const. art. II, § 1 (investing legislative power in the legislature); *see generally Kimoktoak v. State*, 584 P.2d 25, 31 n. 6 (Alaska 1978).

■ On the other hand, a *locally*-overbroad statute is one where the unconstitutional applications can easily be lumped together and severed. To strike such a statute would be "manifestly[ ] strong medicine," *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830, 841 (1973), particularly when the litigant's own activities are not protected, and the legislation clearly intended to proscribe them. In such cases, most courts will excise or construe the challenged portion, whenever possible, to avoid an unconstitutional result. *Cf. State v. Fairbanks North Star Borough*, 736 P.2d 1140, 1142 (Alaska 1987) (in a separation of powers challenge, this court found it was "under a duty to construe a statute to avoid constitutional infirmity where possible"). *See also Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916, 37 L.Ed.2d at 841 (under the federal Constitution, "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute").

Any expenditure or contribution, even one of only $1, will trigger the registration and reporting requirements of the Act. VECO's arguments concerning this minimal threshold are similar to those which were made in *Messerli*. Messerli had argued that the Act was overbroad because, among other reasons, it covers individuals who spent small amounts of money to influence the outcome of a ballot proposition.[20] Our opinion in *Messerli* does not mention this argument.

The Supreme Court of the United States in *Buckley v. Valeo* has indicated that the standard of review under the federal constitution on questions whether thresholds in disclosure laws are too low is one which is deferential to legislative judgments.

> [W]e cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say, on this bare record, that the limits designated are wholly without rationality.

424 U.S. at 83, 96 S.Ct. at 665, 46 L.Ed.2d at 724.

■ We express no opinion on whether that same lenient standard of review is appropriate under the Alaska Constitution, because we see no reason—compelling or rational—for imposing the disclosure requirements on *all* joint activity.

There is a level of joint political activity below which the government has no legitimate interest in regulating. Extreme examples include a father and mother expressing their political views in a letter (to which is affixed a 22¢ stamp) to their child of voting age, a political discussion among a small group of friends over lunch, agreeing to wear buttons at work, and the like.

Admittedly, it is hard to imagine the Commission attempting to enforce the Act in those circumstances. However, in this case, we can eliminate that danger, along with its correlative chilling effect, by a very reasonable exercise of statutory construction.[21] We are confident the legisla-

---

**20.** Petition for Review, *Messerli v. State*, 626 P.2d 81, 82.

**21.** We are influenced by the New Jersey Supreme Court's holding in *N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n*, 82 N.J. 57, 411 A.2d 168 (1980), a case

ture would want the Act, as construed, to survive.

 One of the crucial portions of the Act that contributes to its overbreadth is the definition of "group": " 'group' means ... any combination of two or more persons or individuals acting jointly who take action the major purpose of which is to influence the outcome of an election." AS 15.13.130(4). By construing the word "action" to include only *substantial* action, the Act will not be facially overbroad. Yet, it will remain largely intact to accomplish the legislature's salutary purpose of bringing about major political reform.

In particular, "action" should include only substantial activities that are likely to directly cause more than a few votes to shift, not including intimate activities conducted entirely within one's family circle. Examples of activities ordinarily included are fundraising, making contributions, holding political meetings, and advertising. Examples of activities ordinarily excluded are discussing politics with family or friends over dinner, wearing buttons at the workplace (provided there is no effort to cause more than a few votes to shift), and mailing a letter.

 Admittedly, this construction of the definition of group is more vague than if all action were encompassed, no matter how small. This is exhibitive of the peculiar connection that exists between overbreadth and vagueness: an attempt to remove a statute from one category often causes the statute to jump into the other. However, "action," as we have defined it here, is not unduly vague. Moreover, as applied to VECO, this definition is not even slightly vague. To the extent vagueness problems occur at all, they occur only at the periphery. That has never been grounds for facially invalidating a statute. *See Young v. American Mini Theatres,* 427 U.S. 50, 58–61, 96 S.Ct. 2440, 2446–48, 49 L.Ed.2d 310, 319–21 (1976) (in which, under the federal Constitution, the Su-

preme Court rejected a vagueness challenge, stating that "even if there may be some uncertainty about the effect of the ordinances on other litigants, they are unquestionably applicable to these respondents"). *See generally* L. Tribe, *American Constitutional Law* 718–22 (1978).

It should be noted that the Commission has authority to promulgate regulations that would further refine the definition of group. AS 15.13.030(10). That authority includes the authority to impose an expenditure threshold, below which any activity would be exempt. Such an expenditure threshold would be extremely useful in eliminating any vagueness problem our construction of the definition of group may have created.

### Point 5. *Vagueness*

 The basic element of the doctrine of vagueness is a requirement of fair notice. Laws should give the ordinary citizen fair notice of what is and what is not prohibited. People should not be required to guess whether a certain course of conduct is one which is apt to subject them to criminal or serious civil penalties. *Gottschalk v. State,* 575 P.2d 289, 290 (Alaska 1978); *Stock v. State,* 526 P.2d 3, 8 (Alaska 1974). VECO argues that the definition of "group" is so amorphous and uncertain as to be unconstitutionally vague.

The Act provides that a group—a combination of two or more people acting jointly who take action, the major purpose of which is to influence the outcome of an election (AS 15.13.130(3))—which makes a contribution or expenditure must register and file periodic reports. In our view this definition imparts fair notice that the VECO plan is included, and is not unconstitutionally vague.

VECO relies on the Circuit Court decision in *Buckley v. Valeo,* 519 F.2d 821 (D.C.Cir.1975), which held that the phrase "for the purpose of influencing the outcome of an election" was unconstitutionally vague. *Id.* at 878. *Buckley* is an instruc-

---

similar to this one. The court accepted that the state disclosure requirements would unjustifiably chill unstructured groups spending small sums to influence legislation. *Id.* 411 A.2d at

176. It went on to save the enactment by narrowing the meaning of the statutory phrase "to influence." *Id.* at 177.

tive case but it does not support VECO's position. The court of appeals struck down section 437a of the Federal Election Campaign Act because it found the phrase "purpose of influencing the outcome of an election" too broad. The court found that Congress intended that the language of 437a not be narrowed by use of the adjective "major" before "purpose" because Congress intended section 437a to be broader than another section of the Act which had been narrowed in prior cases by reading in the word "major" before "purpose." *Id.* at 874. Since the Alaska statutory definition of group includes the *major* purpose requirement, the *Buckley* case supports the proposition that our statutory definition is not unconstitutionally vague.

### Point 6. *Privacy*

█ The right of the people to privacy is protected by article I, section 22 of the State Constitution. When a litigant claims that a statute infringes on his right to privacy, our first undertaking is to "determine the nature of [the litigant's] right, if any, abridged by [the statute]." *Ravin v. State*, 537 P.2d 494, 498 (Alaska 1975). Only if the litigant's rights have been abridged do we need to resolve whether the impingement is sufficiently justified. *Id.*

█ We have never yet entertained a claim that a statute theoretically impinges on some unknown person's right to privacy.[22] Thus, challenges based on privacy are unlike claims of overbreadth, where a litigant, in effect, gets "a prize for bringing to judicial attention a statute's potential unconstitutional applications to third parties." L. Tribe, *American Constitutional Law* 720 (1978). The overbreadth exception to the rule against third-party claims has rarely been extended to other types of constitutional arguments.

In its brief, VECO fails to address its own right to privacy. Instead, VECO discusses the rights of two or more people who do not make contributions, and discus-

sion groups. Worthy as those arguments may be, we decline to resolve them until requested to by one of the affected groups.

We do not imply that the specific groups formed by VECO and its employees have no right to privacy. But, the contours of that right have simply not been argued. Under these circumstances, we will not speculate, without evidence, whether that right was abridged.

### Point 7. *Notice of Delinquency*

█ Under AS 15.13.030, "[t]he Commission shall ... notify, by registered or certified mail, all persons who are delinquent in filing reports and statements required to be made under this chapter." VECO argues that under this statute and a regulation which interprets it, the Commission had a duty to notify VECO of its delinquencies and the Commission's failure to fulfill this duty excuses VECO's failure to file reports.

In our view, the duty to notify requirement only applies as to groups which have registered with the Commission pursuant to AS 15.13.050.[23] The legislature could not reasonably have intended the Commission to send delinquency notices to groups of which the Commission is not aware. Of course, the Commission had reason to know that VECO had formed groups as of February 1984. It certainly could have sent VECO delinquency notices at that point. However, stating that is not the same as concluding that the statute required the Commission to send such notices. Such a requirement would be difficult to administer. In every case where the defense of no notice of delinquency was raised an examination of Commission files and Commission personnel would have to be conducted in an effort to determine when the Commission reached the point of having reasonable cause. There is no indication in the statute that the legislature intended such an unwiedly result.

---

22. We have, however, allowed a doctor to raise privacy claims on behalf of his patients, where requiring the patients to raise the claims on their own would require them to forfeit the privacy they seek to protect. *Falcon v. Alaska*

*Public Offices Comm'n*, 570 P.2d 469 (Alaska 1977).

23. *See* footnote 2, *supra.*

### Point 8. *Statement of Reasons*

VECO complains that the Commission should have filed a statement of reasons explaining why the maximum civil penalties were imposed against it. It points out that the Commission had the discretion to assess less than maximum penalties. AS 15.13.125 contemplates that facts in mitigation may be submitted to the Commission by a person against whom a penalty is assessed. VECO claims that such facts were presented by it, but one cannot tell whether they were considered by the Commission in the absence of Commission findings.

We agree that a statement of reasons should be given. It is well established in Alaska that in a formal adjudicative context findings and reasons are required. *Kenai Peninsula Borough v. Ryherd*, 628 P.2d 557, 562 (Alaska 1981).

In *Dickinson v. Davis*, 277 Or. 665, 561 P.2d 1019, 1022–25 (1977), the Oregon supreme court required the Public Utility Commissioner to state the reasons for his decision to mitigate a penalty by twenty-five percent, pursuant to a similar penalty structure. The relevant statute allowed the Commissioner to mitigate any penalty on such terms as he considered proper. *Id.* 561 P.2d at 1022. The court wrote: "precisely because an agency may see mitigation or remission as acts of grace, and by its mere inaction may impose the maximum penalty, these decisions represent greater threats of irrationality, inequality, and misuse." *Id.* at 1023. The court therefore required the Commissioner to identify the reasons for his decision to mitigate, since they would reveal the Commissioner's understanding of the statutory policies. "[A]rticulation of the commissioner's reasons and their application to the case facilitates development of consistent agency policies as the legislature presumably intended, as well as equality of treatment, at least until the Commissioner adopts a reasoned change of policy." *Id.*

The rationale of the *Dickinson* court applies to the present case. The Commission issued a written decision containing findings and reasons on all aspects of this case except with respect to the imposition of the penalty. On that subject the Commission gave no reasons why the maximum penalties were being assessed, nor did it discuss VECO's claims in mitigation. The case will be remanded for further findings and reasons as to this aspect of the case. *See Ryherd*, 628 P.2d at 563 (appropriate remedy is to remand for further statement of reasons where agency's expressed reasons are incomplete).

### Point 9. *Excessive Penalties*

VECO also argues that the aggregate of fines against it amounts to an excessive penalty in violation of the due process clauses of the Alaska and United States Constitutions. The standard here is one of obvious unreasonableness. The penalty cannot be "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis Iron Mountain & Southern Ry Co. v. Williams*, 251 U.S. 63, 67, 40 S.Ct. 71, 73, 64 L.Ed. 139, 141 (1919).

We are unable to say that the penalty imposed is obviously unreasonable. One of the primary purposes of the disclosure requirement is achievement of a fully informed electorate. VECO furnished substantial support to candidates in the 1984 election. The public was not informed of this support and to that extent the statutory purpose was frustrated.

In *Ferre v. State ex rel. Reno*, 478 So.2d 1077, 1082–83 (Fla.App.1985), the court upheld the imposition of a fine in an amount equal to twice the amount of money unlawfully accepted and retained, against a claim that the fine was unconstitutionally excessive. The court found that increasing fines in direct relation to the amount of money unlawfully accepted was rationally related to the purposes of the statute.

Here, VECO has been assessed fines that are nearly double the amount of unreported campaign contributions which it made. The cost of failing to report increases in direct relation to delay in reporting. The penalty structure is rationally related to the goal of timely disclosure.

Point 10. *Accrual of Penalties During Appeal*

The Commission's staff conducted a preliminary investigation of the VECO plan and issued a report on September 19, 1984.[24] The staff recommended to the Commission that, among other things, the three VECO companies be subjected to civil penalties for failing to file several reports, namely the 1983 year end disclosure statement, the thirty day pre-primary campaign disclosure statement, the seven day pre-primary campaign disclosure statement and the ten day post-primary campaign disclosure statement. The staff recommended that VECO also be subject to civil penalties for other reports that would come due prior to the Commission's final decision. As of September 17, 1984, the staff calculated fines totalling $13,170. The Commission, on October 12th, approved the staff's recommendations with respect to the civil penalties. Under the Commission's regulations, the assessment of civil penalties was subject to what the regulations call an appeal under 2 AAC 50.390(e) (eff. 6/29/84). On November 9, 1984, VECO filed a document, entitled Motion for Reconsideration and Motion to Abate Penalties, a section of which was an appeal under regulation .390(e). Subsequently, VECO requested and was given an evidentiary hearing following which the decision of the Commission of February 16, 1985 was issued. Although the decision does not expressly refer to the motion for reconsideration and motion to abate penalties of November 9, 1984, that was the pleading to which the Commission's decision was responding.

After receiving the decision of the Commission of February 1985, VECO promptly appealed to the superior court which granted a stay of the accrual of daily civil penalties retroactive to February 14, 1985. The

fine originally calculated by the Commission staff was $4,390 per group, totaling $13,170, as of September 17, 1984. Because of daily accruals of the penalties and because four additional reports had become due, the penalty increased to $72,660 by February 14, 1985.[25]

a. Daily accruals

▮▮▮▮ VECO argues that the imposition of continuing penalties from the time it initiated its appeal within the Commission on November 9, 1984 until the date that the superior court stayed the penalties, effective February 14, 1985, violates its procedural due process rights.

It relies on the "constitutional tolling" doctrine under which,

a party whose conduct is made the subject of an administrative action must be given an opportunity to obtain a judicial test of the validity of such action, and, as a matter of due process, cannot be subjected to risk that substantial penalties will accumulate during the course of the judicial proceeding.[26]

The state's response to this argument is that assuming that the constitutional tolling doctrine applies, it only applies when the right to judicial review is burdened by the risk of paying substantial penalties. That is not the case here since as soon as judicial review was initiated a stay of the accrual of further penalties was issued. Similarly, the superior court held that VECO could have appealed the Commission order of October 12, 1984. The court referred to AS 44.62.560(a) which provides in part:

Judicial review by the superior court of a final administrative order may be had by filing a notice of appeal ... The right to

**24.** The regulation governing preliminary investigations is found at 2 AAC 50.460 (eff. 5/16/76).

**25.** The four additional reports were the thirty day pre-general report due October 8, 1984, the seven day pre-general report due October 30, 1984, the ten day post-general report due November 16, 1984 and the 1984 year end report due, according to the Commission, January 16, 1985.

**26.** VECO cites the following cases as representing this doctrine: *United States v. Pacific Coast European Conference,* 451 F.2d 712 (9th Cir. 1971); *St. Louis Iron Mountain & Southern Ry. Co. v. Williams,* 251 U.S. 63, 40 S.Ct. 71, 64 L.Ed. 139 (1919); *Wadley Southern Ry. Co. v. Georgia,* 235 U.S. 651, 662–63, 35 S.Ct. 214, 218, 59 L.Ed. 405 (1915).

appeal is not affected by failure to seek reconsideration before the agency.

The court found that VECO chose the option of seeking administrative reconsideration rather than judicial review and concluded that procedural due process was not violated by the accrual of civil penalties during that period.

We find it unnecessary to decide whether the "constitutional tolling" doctrine was applicable in this case because a provision of the Alaska Administrative Code prohibits the accrual of penalties during administrative appeals before the Commission in cases such as this.

> 2 AAC 50.390(g) (eff. 6/29/84) provides:
> If a candidate or group's appeal is:
> (1) denied by the commission, commission staff will notify the candidate or group of its decision within 15 days and require that the civil *penalty originally assessed* be paid within 30 days after the date of the letter containing notification of the commission's decision....

(Emphasis added) By referring to the "penalty originally assessed," the administrative code implicitly prohibits the accrual of penalties until thirty days following notification that the appeal has been denied.

It was therefore improper for the Commission to accrue penalties from the date of the original assessment until thirty days after the Commission issued its opinion on February 16, 1985. As the superior court issued an order staying the accrual of civil penalties after February 14, 1985, no civil penalties from the date of the original assessment should have accrued.[27]

b. New violations.

■ Part of the increase in penalty during the course of the administrative appeal was due to new violations of the Campaign Disclosure Act. Specifically, VECO failed to file four reports due at certain times from October, 1984 to January, 1985—the period surrounding the 1984 election.[28]

We do not believe that these new violations are excused by the "penalty originally assessed" language of 2 AAC 50.390(g), discussed above. That regulation prevents daily penalties from accruing, to avoid chilling the use of the appeals process. But, its purpose is not to immunize a claimant from the consequences of committing new violations. Of course, VECO could have sought to enjoin the state from enforcing the Campaign Disclosure Act. That would require a showing of irreparable harm, among other things. *Alaska Pub. Util. Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549, 554 (Alaska 1975). But in the absence of such a showing, we do not believe 2 AAC 50.390(g) was intended to have the same effect as a preliminary injunction. We are particularly mindful of the fact that two of VECO's new violations involved the failure to file on October 8 and October 30, 1984, just prior to the election—perhaps the most important of all the reports. It was then that the public was most susceptible to influence, and most interested in improper influence.

It is not clear from the record whether penalties for the new violations were even formally assessed prior to the Commission's final decision on February 16, 1985. Yet, it seems that both parties understood the new violations to be included in the appeal. Under these circumstances, the Commission should now determine what portion of the fine can fairly be said to have been "originally assessed" for the four new violations. That portion is properly includable in the fine. However, for the four new violations, just as with the earlier violations, there should have been no further daily increase of the fine.

## CONCLUSION

For the reasons stated, this case is REMANDED to the superior court with in-

27. The appellate record does not immediately reveal the date of the original assessment, or the "penalty originally assessed." Specifically, it is unclear whether that amount is the $4,390 figure (per group) contained in the staff's preliminary investigation, or whether it was a higher figure, assessed some days later. This should be resolved by the Commission when it reassesses the proper penalty.

28. The fines for these new violations, together with the daily accrual thereon, amounted to $23,490 by the time the stay retroactively went into effect on February 14, 1985.

structions to vacate the penalties assessed against VECO and remand the case to the Commission for reassessment of penalties in accordance with this opinion.

MOORE, J., concurring in part, dissenting in part.

BURKE, J., dissenting.

MOORE, Justice, concurring in part and dissenting in part.

I agree with the court's opinion, except insofar as it implies that APOC was correct in determining that *three* groups were involved in this case.

According to APOC, one group consisted of VECO, Inc. and its employees; the other two groups consisted of subsidiary corporations together with their employees. Thus, APOC assessed three separate fines for each violation of the Campaign Disclosure Act.

I think that only one group was involved, consisting of the VECO conglomerate. The joint action required by AS 15.13.130(3) extended beyond the individual corporate units and their employees. It involved a single plan, evidently directed by the chairman of VECO.

When there is any ambiguity about the outer bounds of joint activity, the purposes of disclosure require that the largest possible network be considered a single group. We have said that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Messerli v. State*, 626 P.2d 81, 85 (Alaska 1980). This cleansing effect would be diluted, if not frustrated altogether, if a large group could be disguised as several smaller groups.

Since I would require the joint activity at issue in this case to be reported as a single group, I would also assess a single fine for

each *failure* to report. Admittedly, imposing a separate penalty on each subgroup would make the total penalty, and therefore the total deterrent effect, much higher. However, the threat of criminal prosecution pursuant to AS 15.13.120(a) already provides ample deterrence.

While VECO did not appeal this issue, I think it was plain error. On remand, APOC should reassess the penalties accordingly.

BURKE, Justice, dissenting.

I dissent.

Since its effective date,[1] the Alaska Constitution has contained the following guarantee: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Alaska Const. art. I, § 5. Today, without giving serious consideration to the meaning of this provision, this court puts its stamp of approval on legislation which imposes substantial and prior restraints on the right to speak in support of, or in opposition to, political candidates and ballot issues.[2] Such legislation is, in my judgment, patently invalid. I believe it is our duty to declare the Alaska campaign disclosure law unconstitutional, upon the ground that it infringes upon an absolute right: the right, under article I, section 5, to engage in political speech without government interference, *so long as there is no abuse, or at least some threatened abuse, of that right.*

Preliminarily, it should be noted that the majority repeats a mistake that was made in *Messerli v. State*, 626 P.2d 81 (Alaska 1980), where the court insisted upon viewing article I, section 5 as a provision which "on [its] face would appear to admit of no exceptions and which would prevent any restrictions by the legislature." 626 P.2d at 83 (footnote omitted). On this basis, the

1. The Alaska Constitution became effective on the date Alaska was admitted to the Union, January 3, 1959.

2. The majority concedes, and the parties appear to agree, that VECO's political activities are a form of "speech," and that the Alaska campaign

disclosure law purports to regulate, and thereby "burdens," the exercise of the rights of free speech and political association. In *Alaska Gay Coalition v. Sullivan*, 578 P.2d 951, 959 (Alaska 1978), these were described as "fundamental rights."

court approved of the campaign disclosure law, "because absolute freedom of speech ... in all situations and on all occasions would in certain instances be incompatible with the preservation of other rights essential in a democracy." *Id.* The same rationale is now used in the case at bar.

This, of course, is an entirely inaccurate description of article I, section 5. If anything is clear, it is that the right guaranteed by that section is *not* absolute under all circumstances; article I, section 5 expressly states that persons exercising their right of free speech are "responsible for the abuse of that right." [3] Thus, the question in this case, as in *Messerli,* is not whether the right guaranteed by article I, section 5 is an absolute right. Undoubtedly there are times when it is not. The question is, whether limitations may be imposed—in this case limitation upon the right to speak in support of, or in opposition to, political candidates or ballot issues—without regard to whether the right to speak is being abused. This question, unfortunately, is not addressed by the majority, except by implication.

In my judgment, the meaning of article I, section 5 is too plain to be misunderstood.[4] It clearly prohibits any and all limitations upon the right of free speech, other than those dealing with the abuse of that right. *See State v. Coe,* 679 P.2d 353 (Wash.1984) (identical provision in the Washington Constitution "absolutely forbids" prior restraints against constitutionally protected speech).[5] My colleagues, nevertheless, insist upon treating this question as if it were the same as the First Amendment question, which it is not. "Balancing" the importance of an individual's right to speak against society's need for the restrictions imposed by the campaign disclosure act, they conclude that there is a compelling governmental interest in the latter. The intrusion upon the individual's right to speak is said to be justified, because it (1) serves the need for an informed electorate, by identifying those supporting or opposing a particular candidate or ballot issue; (2) deters corruption and the appearance of corruption; and (3) aids in the detection of campaign contribution limit violations.

I have no quarrel with the majority's belief that these are worthwhile goals, which should be balanced against the danger that exists when people are free to speak in support of, or in opposition to, political candidates or ballot issues, *unhampered by restrictions such as those found in Alaska's campaign disclosure law.* This, however, is exactly what occurred when the people ratified and adopted the state constitution. The required "balancing," in other words, has already been done *by the people.* This being so, it is beyond the power of the legislature and this court to say that the people made the wrong choice. As the only body of state law approved and adopted by direct vote of the people, the constitution is supreme. Alaska Const. art. I, § 2 (all political power resides in the people).

---

**3.** The court, in *Messerli,* did acknowledge that its description of article I, section 5 was "not entirely accurate," noting the language quoted above. This part of article I, section 5, however, was said to be "not pertinent to the discussion in [the] case," and was otherwise ignored. 626 P.2d at 83 n. 10.

**4.** Several states have constitutional provisions similar to Alaska's article I, section 5. *See State v. Coe,* 679 P.2d 353, 360–61 (Wash.1984). Article I, section 5 of the Washington Constitution, for example, is identical. The Washington provision was modeled after one that was contained in the California Constitution of 1879. *Id.* When called upon to interpret this provi-

sion, the California Supreme Court, more than ninety years ago, stated:

> The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed.... It is patent that this right to speak, write, and publish cannot be abused until it is exercised, and before it is exercised there can be no responsibility.

*Dailey v. Superior Court,* 112 Cal. 94, 44 P. 458, 459 (1896).

**5.** This is the usual and ordinary meaning of the words used, and there is nothing in the history of article I, section 5 to suggest an that those words were intended to have some other meaning. *See* 2 Proceedings of the Alaska Constitutional Convention 1305–07 (January 5, 1956).

Whether or not the legislature believes the legislation in question is necessary, and irrespective of this court's agreement or disagreement with the legislature's judgment, there is an unqualified constitutional prohibition against laws restraining the right to speak, so long as the speaker does not abuse that right. It defies logic, as well as accepted principles of constitutional law, to allow this express prohibition to be overridden by a statute which imposes direct restraints on the very right the constitution protects. *See Matthews v. Quinton,* 362 P.2d 932, 944 (Alaska 1961) (police power may not be exercised in contravention of plain and unambiguous constitutional provisions). The fact that it is being overridden for a worthwhile purpose is immaterial.

It is possible to conclude, I suppose, that the people didn't know what they were doing when they ratified article I, section 5, and that we, therefore, are entitled to protect them from the consequences of such action. This, however, is a dangerous step, and one that I do not care to take. The decision in this case suggests that the majority may feel otherwise.