*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RBG BUSH PLANES, LLC, | ) | |
| | ) | Supreme Court No. S-15397 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-13052 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ALASKA PUBLIC OFFICES | ) | |
| COMMISSION, | ) | No. 7063 – November 25, 2015 |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Timothy A. McKeever and Scott M. Kendall, Holmes Weddle & Barcott, PC, Anchorage, for Appellant. Janell M. Hafner, Assistant Attorney General, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Winfree, Stowers, and Bolger, Justices. [Fabe, Chief Justice, and Maassen, Justice, not participating.]

STOWERS, Justice.

## I.    INTRODUCTION

Alaska law forbids corporations from making direct contributions to candidates for public office.[1]  And in 2010 a corporation that provided a service to a candidate for less than a "commercially reasonable rate" or the "normal charge . . . in the

---

[1]     AS 15.13.074(f).

market" was deemed to have made a contribution to the candidate equal to the difference between the commercially reasonable rate and the amount charged.[2]

In September 2010 RBG Bush Planes, LLC (Bush Planes) allowed two candidates for the Lake and Peninsula Borough Assembly to travel on a series of pre-existing flights throughout the borough. Bush Planes charged the candidates a fraction of the fuel costs associated with those flights. The Alaska Public Offices Commission (Commission) investigated these charges, determined that Bush Planes' fractional fuel-cost methodology did not represent a commercially reasonable rate, and assessed a $25,500 fine against Bush Planes for making illegal corporate contributions. Bush Planes appealed to the superior court, which affirmed the Commission.

Bush Planes again appeals, arguing (1) that the Commission erred when it found Bush Planes had violated Alaska law and (2) that the fine the Commission imposed was unconstitutionally excessive. Bush Planes also appeals the superior court's denial of Bush Planes' motion to supplement the record with allegedly recently discovered evidence and related briefing suggesting Commission bias against Bush Planes. We affirm the superior court's decisions for the reasons discussed below.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Bush Planes is a limited liability company that holds title to several airplanes. It is owned by a revocable trust created for Robert B. Gillam, and it operates as a private carrier under Part 91.[3]

---

[2]     2 Alaska Administrative Code (AAC) 50.250(a)(3)(G), (c) (2006). We note that 2 AAC 50.250 has since been amended, but this appeal concerns the pre-amendment language in effect in 2010.

[3]     General Operating and Flight Rules, 14 C.F.R. pt. 91 (2015). As a Part 91
(continued...)

Gillam is involved in the politics surrounding mining development in the Bristol Bay area, and he hired George Jacko to be his "eyes and ears in Bristol Bay." Jacko traveled throughout the Lake and Peninsula Borough and flew on Bush Planes' aircraft for his travel. Jacko asked Gillam if he could offer flights to two candidates for the Lake and Peninsula Borough Assembly, Nana Kalmakoff and Michelle Ravenmoon. Gillam consulted counsel and later approved allowing the two candidates to fly with Jacko on Bush Planes' flights. But Gillam also required that the fuel costs for each flight be recorded.

In 2010 Jacko traveled with Kalmakoff and Ravenmoon on two separate trips: one from September 3 through September 6 and another from September 17 through September 18. While some of the flights included both candidates, on others only Kalmakoff or Ravenmoon was present. Bush Planes invoiced Ravenmoon and Kalmakoff for a fractional portion of the fuel costs related to the flights they took.[4] Ravenmoon paid a total of $351.55, and Kalmakoff paid $1,184.60.

After the election the Commission received two complaints from the Lake and Peninsula Borough regarding the trips Ravenmoon and Kalmakoff took with Jacko. The Commission dismissed the complaints without filing charges, but the Commission staff continued investigating the allegations.

By March 9, 2011, the investigation had produced sufficient information that the Commission's assistant director, Jerry Anderson, intended to have the

---

[3](...continued) operator Bush Planes may only charge a candidate for public office an amount that does not "exceed the amount required under the applicable state or local law." 14 C.F.R. § 91.321(a)(3).

[4]     Bush Planes intended to bill the candidates for half of the fuel used on each flight. Bush Planes actually billed the candidates more than one-half of the fuel costs due to an accounting error. That discrepancy does not affect our decision.

Commission's staff file a complaint. By March 30, 2011, Anderson directed one of the Commission's staff attorneys to begin drafting a complaint. But the Commission's staff continued investigating the allegations into April, and the Commission's staff did not file a complaint until July 7, 2011.

## B. Proceedings

The Commission staff's complaint alleged that Bush Planes had violated AS 15.13.074(f), which prohibits a corporation from making a contribution to a candidate.[5] "Contribution" is defined in both AS 15.13.400 and former 2 AAC 50.250. Relevant here are two definitions previously contained in 2 AAC 50.250. The first definition specifically excluded from the meaning of "contribution" the "provision of a service . . . to a candidate . . . if the entity providing the service . . . is paid at a *commercially reasonable rate* within a commercially reasonable time."[6] The second definition stated:

> The provision of goods or services without charge, or at a charge that is less than the *normal charge for the goods and services in the market*, is a contribution unless a lower rate is extended to all campaigns. If goods or services are provided at less than the normal charge in the market, the amount of the nonmonetary contribution is the difference between the normal charge for the goods or services at the time of the contribution and the amount charged.[7]

The staff alleged that charging Ravenmoon and Kalmakoff fractional fuel costs alone was not commercially reasonable. The staff also alleged that a fuel-only

---

[5] The complaint also included allegations against Gillam, McKinley Capital Management, Ravenmoon, and Kalmakoff. Only the charges against Bush Planes are relevant to this appeal.

[6] 2 AAC 50.250(a)(3)(G) (2006) (emphasis added).

[7] 2 AAC 50.250(c) (2006) (emphasis added).

valuation "ignore[d] all of the other normal and customary expenses associated with aircraft use" and noted the following additional expenses: "[o]il, maintenance, an engine reserve . . . , a propeller reserve . . . , insurance, hang[a]r fees, . . . inspection fees," and the pilot's salary. Thus, the staff claimed that Bush Planes had not charged a commercially reasonable rate and had made a prohibited corporate contribution to both candidates.

### 1. The Commission hearing

The Commission members heard the case against Bush Planes during one day of testimony presided over by an administrative law judge. One of the main issues during the hearing was whether Bush Planes had charged the candidates a commercially reasonable rate.

Gillam testified regarding Bush Planes' costs. He stated that he owned the hangar in Anchorage where Bush Planes stored its aircraft and personally paid for the "heat, lights, taxes, [and] maintenance" related to the hangar. He did not testify as to how much he paid, nor did he provide Bush Planes' maintenance costs or the cost to run each of Bush Planes' aircraft on a per-hour basis. Gillam noted that McKinley Capital paid the pilots' salaries and benefits in exchange for Bush Planes making its aircraft available to McKinley Capital when it needed them for its business.

Greg O'Keefe, McKinley Capital's chief financial officer, testified regarding Bush Planes' costs.[8] O'Keefe testified that the amount of time Bush Planes' aircraft spent in the air did not affect Bush Planes' fixed costs. But he did not provide values for these fixed costs or the agreement between McKinley Capital and Bush Planes regarding piloting services.

---

[8] It appears McKinely Capital handles certain accounting functions for Bush Planes.

O'Keefe further testified that Bush Planes does not set aside money for maintenance reserves or propeller reserves and that Bush Planes' maintenance costs do not depend on the number of hours flown other than "a hundred-hour annual" maintenance. He testified that the variable costs, the ones "you would incur as a result of operating the plane," would be "the fuel, perhaps a little bit of oil, maybe some Windex . . . and maybe some minor supplies like air sickness bags, things like that."

Glen Alsworth testified regarding airfare. Alsworth, the mayor of the Lake and Peninsula Borough, was also the president of a for-profit air carrier, Lake Clark Air. Alsworth was provided with the flight plan for the trips the candidates took, and he asserted that it would cost $950 per hour multiplied by the flight hours to charter these flights and that there would be standby and overnight charges.

Alsworth also provided seat fares[9] for each leg of the two itineraries. These fees ranged from $60 to $400. Alsworth stated that $1,240 "would be just a . . . screaming deal" for a passenger taking all of the flights in the first trip and that $500 for the entire second trip was possible but would be "the steal of the century."[10]

David Wilder, owner of Lake and Peninsula Airlines,[11] testified that the charter cost for the first trip would be approximately $10,450 and the seat fare would be $2,500. For the second trip, Wilder estimated a charter cost of $2,800 and a seat fare of

---

[9]     As used in the hearing, a seat fare is the amount a carrier would charge someone who wanted to purchase a seat on a pre-existing charter flight.

[10]     Using Alsworth's seat fares, Kalmakoff should have paid $1,125 for her participation in the first trip and $560 for her participation in the second trip. Kalmakoff paid Bush Planes $1,184.60. Similarly, Alsworth's seat fares indicate Ravenmoon should have paid $1,040 for her participation in the first trip and $100 for her participation in the second trip, but Ravenmoon only paid $351.55.

[11]     Wilder was also a member of the Lake and Peninsula Borough Assembly until he lost his seat to Ravenmoon in the 2010 election.

approximately $700. When asked about charging $306[12] for a seat fare on the first itinerary, Wilder indicated that it would be "impossible for us . . . . It doesn't make economic sense . . . when somebody else is paying $9,000 for a charter and you go well, we're going to let two more people hop on for 300 bucks, . . . I wouldn't do that." He noted that $306 was "not in the ballpark."

### 2. The Commission's decision

The Commission, with the administrative law judge's assistance, found that the lowest commercially reasonable rates supported by the evidence presented were the seat fares to which Alsworth had testified. Comparing those seat fares with the amounts Bush Planes charged the candidates, the Commission found that Bush Planes had undercharged Ravenmoon by $788.45 and Kalmakoff by $500.40.

The Commission specifically addressed whether Bush Planes' fuel-only methodology represented a commercially reasonable rate. It noted that one of the Commission's advisory opinions had indicated that it might be sufficient to charge a candidate the "actual cost" of a flight,[13] but it (1) disavowed the concept of using actual costs when a candidate flies on a company plane "in an area where market rates for seat fares can be ascertained" and (2) held that even under an actual-cost methodology, Bush Planes needed to account for both its variable and fixed costs. But the Commission found that Bush Planes had failed to provide a "credible cost-based valuation taking all costs into account."

---

[12]    Bush Planes charged Ravenmoon $306.21 for the first set of flights.

[13]    *See* STATE OF ALASKA, DEP'T OF ADMIN., ALASKA PUB. OFFICES COMM'N ADVISORY OP., AO 06-03-CD, at 5 (Oct. 31, 2006), *available at* http://aws.state.ak.us/ApocReports/Paper/Download.aspx?ID=4877 (hereinafter PEREZ OP.).

The Commission next considered the penalty to impose on Bush Planes and discussed several factors. It noted that Gillam was Bush Planes' principal and that he had previous experience with the Commission, including a $100,000 settlement in 2010 related to alleged campaign disclosure violations. The Commission found that Bush Planes had "substantial assets and . . . sophisticated management" and that its conduct had "great potential to alter the outcome of elections to the detriment of candidates not so favored." The Commission further found that Bush Planes "engaged in a questionable practice without adequately exploring its legality, . . . embroil[ing] two unsophisticated candidates in its wrongdoing." Therefore, the Commission concluded "a strong deterrent fine [was] necessary" and imposed a penalty of $25,500.[14]

The Commission also imposed $10,668 in investigation and adjudication costs and $19,100 in attorney's fees.[15] Thus, the Commission's final award against Bush Planes was for $55,268: $25,500 in fines, $10,668 in adjudication and investigation costs, and $19,100 in attorney's fees.

### 3. The superior court's ruling

Bush Planes appealed the Commission's decisions to the superior court, and the parties completed their briefing in November 2012. Approximately six months later, shortly before the scheduled oral argument, Bush Planes filed a motion to supplement the record arguing that it had recently obtained "clear evidence that [the Commission]

---

[14] The maximum statutory penalty is $50 per day per violation until the violation is remedied. AS 15.13.390(a). Despite each candidate participating in two separate itineraries, the Commission based the fine on a single violation for each candidate and calculated the number of days since the violation until the violation was remedied as 255 days. Thus, $50 x 255 days x 2 violations = $25,500.

[15] Alaska Statute 15.13.390(b) states that when the Commission finds a violation "the commission shall assess . . . the commission's costs of investigation and adjudication[] and . . . reasonable attorney fees."

and the [Commission's] Staff . . . were biased and prejudiced against it." Bush Planes argued that the new evidence demonstrated that Bush Planes was denied "its fundamental due process right to an impartial tribunal."

Bush Planes claimed that it only obtained the new evidence after the close of the briefing and that the importance of the evidence, along with its unavailability to Bush Planes during the earlier briefing, justified supplementing the record and its briefing. The Commission opposed the motion, noting that Bush Planes had obtained much of the evidence it wanted to introduce approximately four months earlier and that none of the evidence was sufficient to demonstrate impermissible bias or prejudice.

Superior Court Judge Catherine M. Easter affirmed the Commission's decision regarding Bush Planes' liability. She also held that the fine was not unconstitutionally excessive and that it was not an abuse of discretion. Judge Easter denied the motion to supplement the record without comment and did not reach the merits of Bush Planes' due process argument.

Bush Planes now appeals the Commission's finding of liability and the penalty it imposed, as well as the superior court's denial of its motion to supplement the record and file a supplemental brief.

## III.   STANDARD OF REVIEW

"Where the superior court is acting as an intermediate court of appeals, we directly review the agency decision"[16] using one of four standards of review depending on the issues on appeal:

> The "substantial evidence" test is used for questions of fact.
> The "reasonable basis" test is used for questions of law

---

[16]     *Alaska Police Standards Council v. Parcell*, 348 P.3d 882, 886 (Alaska 2015) (quoting *West v. Municipality of Anchorage*, 174 P.3d 224, 226 (Alaska 2007)) (internal quotation marks omitted).

involving agency expertise. The "substitution of judgment" test is used for questions of law where no expertise is involved. The "reasonable and not arbitrary" test is used for review of administrative regulations.[17]

We review a superior court's ruling on a motion to supplement the record for abuse of discretion.[18] The superior court abuses its discretion when it acts in a manifestly unreasonable manner.[19]

## IV. DISCUSSION

Bush Planes argues that (1) the Commission erred in finding that Bush Planes made an illegal corporate contribution to a candidate; (2) the Commission imposed an unconstitutionally excessive fine on Bush Planes; and (3) the superior court abused its discretion when it denied Bush Planes' motion to supplement the record and allow its supplemental brief. We conclude that none of these decisions was erroneous and affirm.

### A. The Commission Did Not Err When It Found That Bush Planes Made An Illegal Corporate Contribution.

Bush Planes challenges the Commission's determination that Bush Planes violated the prohibition on corporate contributions to candidates. Bush Planes argues that (1) the phrase "commercially reasonable rate" is ambiguous; (2) because "commercially reasonable rate" is ambiguous, the Commission should have deferred to

---

**17** *Skvorc v. State, Pers. Bd.*, 996 P.2d 1192, 1196-97 (Alaska 2000) (quoting *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

**18** *Southwest Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Alaska Marine Highway Sys.*, 941 P.2d 166, 172 (Alaska 1997).

**19** *Tobeluk v. Lind*, 589 P.2d 873, 878 (Alaska 1979) ("We will not interfere . . . unless it is shown that the court abused its discretion by issuing a decision which is arbitrary, capricious, manifestly unreasonable, or which stems from an improper motive.").

Bush Planes' actual-cost methodology; and (3) the Commission ignored Bush Planes' evidence that it did not incur any costs other than the variable fuel costs it charged the candidates.

### 1. The Commission's Perez Opinion rendered the terms "commercially reasonable rate" and "normal charge in the market" ambiguous.

The Commission's finding that Bush Planes is liable for campaign violations centers on the proper interpretation of two phrases: (1) "commercially reasonable rate" and (2) "normal charge in the market."[20] Bush Planes argues these phrases are ambiguous while the Commission disagrees.

A regulation is ambiguous when "[it] is capable of two or more equally logical interpretations."[21] And "ambiguous statutory or regulatory requirements must be strictly construed in favor of the accused before an alleged breach may give rise to a civil penalty."[22] This rule has its genesis in the doctrine of vagueness, which requires that the law "give the ordinary citizen fair notice of what is and what is not prohibited."[23] "People should not be required to guess whether a certain course of conduct is one which

---

[20] 2 AAC 50.250(a)(3)(G), (c) (2006). Bush Planes briefly argues that using two different phrases in the regulation makes the regulation inherently ambiguous, but we disagree and interpret them similarly here.

[21] *State v. Bernard*, 625 P.2d 311, 313 (Alaska 1981) (per curiam). Because the question of regulatory ambiguity presented here is a question of law not involving agency expertise, we review it under the substitution of judgment standard. *See Alaska Pub. Offices Comm'n v. Stevens*, 205 P.3d 321, 324-26 (Alaska 2009).

[22] *Stevens*, 205 P.3d at 326.

[23] *Id.* at 325 (quoting *VECO Int'l, Inc. v. Alaska Pub. Offices Comm'n*, 753 P.2d 703, 714 (Alaska 1988)).

is apt to subject them to criminal or serious civil penalties."[24]  But to take advantage of any regulatory ambiguity, the accused party's interpretation may not be "strained or outlandish."[25]

In the abstract, "commercially reasonable rate" and "normal charge in the market" do not appear ambiguous because they focus the analysis on the price available on the open market.  But the Commission injected ambiguity into these phrases when it released a 2006 advisory opinion referred to as the Perez Opinion.[26]

The Perez Opinion considered whether Alaska law required the governor to reimburse the state for travel on state aircraft when the governor engages in both state business and campaign-related activities.[27]  The opinion noted that the state may not make a contribution to a candidate and concluded that "if the governor's reelection campaign reimburses the state at a reasonably commercial rate . . . for state-provided

---

[24]     *VECO Int'l*, 753 P.2d at 714 (citing *Gottschalk v. State*, 575 P.2d 289, 290 (Alaska 1978)).

[25]     *See Bernard*, 625 P.2d at 313 ("That one [interpretation] is more logical than the other does not cure the ambiguity of the regulation when the less logical method is not strained or outlandish."); *see also Theodore v. State*, 407 P.2d 182, 189 (Alaska 1965) ("We agree with appellant that a vague . . . regulation, the breach of which carries a criminal penalty, should be strictly construed in favor of the accused.  However, we believe that a common sense, unstrained, reading of both descriptions provides a reasonably concise description of the areas and leaves no room for the argument advanced by appellant.").

[26]     *See* PEREZ OP., *supra* note 13.  The opinion is known as the "Perez Opinion" because it was requested by Governor Frank Murkowski's Administrative Director, Linda Perez. *Id.* at 1.

[27]     *Id.* at 1.

travel, state-provided travel would not be a prohibited contribution."[28]  The opinion continued:

> Because reimbursement is required . . . , we must address what constitutes a commercially reasonable rate for reimbursement.  There are probably many possibilities.  *One obvious method might be to determine the state's actual costs and reimburse those costs*.  Another method is suggested in federal regulation . . . . Using either of these methods for determining the value of state-provided travel would satisfy the requirement of payment at a commercially reasonable rate.[29]

But "actual cost" is inconsistent with the market-based approach that "commercially reasonable rate" and "normal charge in the market" seem to require.  Actual cost leaves no accounting for profit margin, an almost ever-present aspect of a commercially reasonable rate.  And an actual-cost methodology changes the regulation's focus from a broad, market-based analysis of available fares to identifying the costs specific to an individual service provider.  Thus, the Commission's interpretation of the regulation in the Perez Opinion inserted ambiguity into the regulation's meaning.  In light of this ambiguity, we will strictly construe the regulatory language in Bush Planes' favor so long as Bush Planes' interpretation of the regulation is not strained.

### 2. Bush Planes' interpretation of the actual-cost methodology endorsed in the Perez Opinion is strained.

Bush Planes argues that the Perez Opinion "can reasonably be read as contemplating that the primary purpose [of a flight] must pay for all costs the primary

---

**28**  *Id.* at 5.

**29**  *Id.* at 5-6 (emphasis added).  The Perez Opinion went on to endorse a valuation method involving first-class, coach, and charter fares depending on the circumstances, but it specifically noted that the Commission was not precluding other valuation methods. *Id.* at 6.

purpose would otherwise incur, and candidates pay only those actual costs caused by their additional activity." Bush Planes asserts that the evidence before the Commission was that the only additional costs Bush Planes incurred because of the candidates' presence on its flights were for fuel and minor incidentals. Thus, Bush Planes contends, these additional costs are all Bush Planes needed to charge the candidates under an actual-cost methodology.

The Commission responds that an actual-cost methodology must account for fixed costs and that other companies incorporate fixed costs into their fares. The Commission argues that Bush Planes' failure to include these costs renders its actual-cost methodology invalid.[30]

We conclude that Bush Planes' interpretation of "actual cost" is strained. Bush Planes' additional-costs methodology fails to recognize that Bush Planes is the beneficiary of unique advantages: it does not pay for pilots or hangar fees. The idea that Bush Planes could use its "actual costs" when it possesses these advantages is patently unreasonable, especially considering that the Perez Opinion gave no indication that the State enjoyed similar advantages when the Perez Opinion endorsed the actual-cost methodology. As Gillam testified, "If you know anything about Alaska airplanes, there's a lot of expense." That expense is not simply the cost of fuel. It is all of the costs that surround the operation of the plane.

Bush Planes' interpretation of the relevant language is clearly not what was intended by "actual cost" in the Perez Opinion. The Perez Opinion was providing

---

[30] Determining whether Bush Planes adopted a strained interpretation of the regulations at issue here is a question of law that does not implicate agency expertise. Therefore, we apply our independent judgment when reviewing this issue. *Skvorc v. State, Pers. Bd.*, 996 P.2d 1192, 1196-97 (Alaska 2000) (quoting *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

guidance regarding what would be a commercially reasonable rate.[31]  No reasonable person would read the Perez Opinion and believe that in trying to determine a commercially reasonable rate, he could charge only his additional costs when he was the recipient of significant cost reductions not generally available.

Bush Planes' argument to the contrary is not persuasive.  Its argument ignores the regulation's attempt to place all candidates in the same position by creating a level playing field.  This is best exemplified by the fact that the regulation requiring a service provider to bill for the normal charge in the market did not apply *if the discounted charge was offered to all candidates*.[32]  Additionally, the practical effect of requiring a commercially reasonable rate is that it prevents one candidate from benefitting from an advantage that other candidates may not have because they are not as well connected.

Bush Planes also argues that its fuel-only approach was a reasonable interpretation of its allegedly competing obligations under state and federal law.  But Bush Planes' basic premise — that there is tension between state and federal law — is incorrect.  14 C.F.R. § 91.321(a)(3) permits a private air carrier to charge candidates for elected office an amount that does not "exceed the amount required under applicable state or local law."  Bush Planes contends that to ensure compliance with this federal regulation it must charge the candidates the lowest possible rate and to ensure compliance with state law it must charge the highest possible rate.

---

[31]     PEREZ OP., *supra* note 13, at 5-6.

[32]     2 AAC 50.250(c) (2006).

We read 14 C.F.R. § 91.321(a)(3) as a carve-out provision to allow private air carriers to operate within the boundaries of state law.[33] So long as Bush Planes complies with state law, including the Commission's regulations, it will not violate 14 C.F.R. § 91.321(a)(3).[34] There is no reason to believe that a fuel-only approach was necessary to avoid violating federal regulations.

Thus, we hold that Bush Planes' interpretation of the actual-cost methodology approved in the Perez Opinion was strained. As a result, we affirm the Commission's decision because the Commission was not required to defer to Bush Planes' interpretation and could enforce its own reasonable interpretation of "commercially reasonable rate."[35]

B. **The Fine The Commission Imposed Against Bush Planes Was Not Unconstitutionally Excessive.**

The Commission assessed a $25,500 fine against Bush Planes, as well as $29,768 in investigation and adjudication costs and attorney's fees. Noting that its total contribution was $1,288.25 — the amount the candidates underpaid for the flights using the Commission's calculations — Bush Planes argues that the award against it is

---

[33] The Federal Aviation Administration's public notice regarding promulgation of 14 C.F.R. § 91.321(a) stated that the regulation permitted the carrier "to accept payment *in accordance with state or local law*." Carrying Candidates in Elections, 70 Fed. Reg. 4980-01 (Jan. 31, 2005) (emphasis added) (codified at 14 C.F.R. § 91.321(a)).

[34] Bush Planes cites no cases where a Part 91 carrier was found to have acted permissibly under state law and impermissibly under 14 C.F.R. § 91.321(a)(3), nor has our independent research identified such a case.

[35] Because we conclude the Commission did not need to defer to Bush Planes' interpretation of "commercially reasonable rate" and "normal charge in the market," we do not address Bush Planes' claim that the Commission ignored evidence regarding its actual costs.

unconstitutionally excessive and cites to our punitive damages cases for support.[36] Bush Planes also discusses a number of factors that it believes demonstrates the unreasonableness of the penalty. These factors include (1) that Bush Planes made a good faith effort to comply with ambiguous regulations; (2) that this was Bush Planes' first violation; (3) that the violation was a "one-time event"; (4) that Bush Planes was trying to comply with the Perez Opinion and federal law; (5) that this was not a particularly serious violation; (6) that the amount of the illegal contribution was not so large as to imply corruption; and (7) that there was no special harm because there was no indication that the candidates would not have taken these flights if charged the seat fare the Commission endorsed.

Bush Planes additionally argues that the Commission's fine calculation, which relied on the number of days between the offense and when the violation was remedied, was not reasonably related to the offense and that the Commission was actually ready to file a complaint in March but chose to wait to file to trigger a higher fine. Bush Planes contends that the days after March should not have been counted against it when calculating the fine.

---

[36] Bush Planes argues that we should consider both the fine and the costs and fees awarded against it when determining whether the penalty was excessive. We disagree. The costs and fees awarded here appear similar to those awarded under Alaska Rule of Civil Procedure 82, which are intended "to partially compensate a prevailing party for the costs to which he has been put in the litigation in which he was involved." *De Witt v. Liberty Leasing Co. of Alaska*, 499 P.2d 599, 602 (Alaska 1972) (discussing attorney's fees under Alaska Rule of Civil Procedure 82). The compensatory nature of these costs and fees means that they are not intended to penalize a person who commits a violation of Alaska's campaign finance laws and are imposed without specific regard for the seriousness of the offense. Thus, we hold that the costs and fees awarded against Bush Planes are not part of the excessive-penalty analysis.

The Commission asserts that the fine is constitutional because Bush Planes "committed a serious campaign violation with the potential to significantly harm the electoral process" and argues that comparisons to punitive damages cases are not on point. The Commission also argues that it fairly considered Bush Planes' assets, experience, and filing history and that a substantial fine was appropriate considering that Bush Planes' principal is a sophisticated participant in Alaska's election process and Bush Planes' actions caused two novice candidates to violate the Commission's regulations. The Commission contends that its inclusion of the days between the end of March and when the complaint was filed in July was reasonable because (1) Bush Planes "knew or should have known it was charging far less than a commercially reasonable rate for the services it offered" and (2) the Commission was still investigating and seeking documents in April.

### 1. The Commission did not impose an unconstitutionally excessive fine.

We have held that the a penalty is unconstitutionally excessive when it is obviously unreasonable.[37] "The penalty cannot be 'so severe and oppressive as to be wholly [disproportionate] to the offense and obviously unreasonable.' "[38] The federal case both parties cite, *United States v. Bajakajian*, similarly holds that a fine "must bear some relationship to the gravity of the offense that it is designed to punish."[39]

---

[37] *VECO Int'l, Inc. v. Alaska Pub. Offices Comm'n*, 753 P.2d 703, 716 (Alaska 1988). We note that because this is a question of constitutional law "[we] apply our independent judgment." *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 65 (Alaska 2001).

[38] *VECO Int'l*, 753 P.2d at 716 (quoting *St. Louis Iron Mountain & Southern Ry .Co. v. Williams*, 251 U.S. 63, 67 (1919)).

[39] 524 U.S. 321, 334 (1998).

The prohibition on corporate contributions was part of a broad campaign finance reform bill in 1996.[40] That reform had several purposes. Relevant here is the legislature's finding that "organized special interests are responsible for raising a significant portion of all election campaign funds and may thereby gain an undue influence over . . . elected officials."[41] The legislature was also concerned that "penalties for violations of the existing campaign finance laws [were] far too lenient to deter misconduct."[42] The legislature intended "to substantially revise Alaska's campaign finance laws in order to restore the public's trust in the electoral process and to foster good government."[43] In so doing, it also increased the per-day statutory penalty from $10 to $50.[44]

Bush Planes attacks the fine imposed as unconstitutionally excessive because the amount of its contribution was substantially less than the amount of the fine. Bush Planes also asserts that its violation "was not particularly grave" because it gave "only slightly more than double what an individual could have contributed to one candidate."[45] Bush Planes notes that candidates who expect to raise or spend less than $5,000 may seek an exemption from reporting contributions to their campaigns,[46] which

---

[40]     *See* ch. 48, § 1, SLA 1996.

[41]     Ch. 48, § 1(a)(3), SLA 1996.

[42]     Ch. 48, § 1(a)(6), SLA 1996.

[43]     Ch. 48, § 1(b), SLA 1996.

[44]     Ch. 48, § 22, SLA 1996.

[45]     *See* AS 15.13.070(b)(1) (limiting individual contributions to certain individuals and organizations to $500 per year).

[46]     AS 15.13.040(g); *see also* 2 AAC 50.286(a).

Bush Planes argues demonstrates that the legislature would not consider its contributions to Ravenmoon and Kalmakoff a threat to the democratic process.

But Bush Planes' focus on the amount of the fine compared to the amount of the improper contribution fails to account for the problems the legislature was attempting to solve. The legislature believed that the public had lost faith in the electoral process and that organized special interests, which ostensibly included corporations, had gained undue influence over elected officials by contributing substantial sums of money to them.[47] And the legislature appears to have decided to ban direct corporate contributions to individual candidates for these reasons.

In this context Bush Planes did not simply donate approximately $1,200 illegally. Bush Planes' actions called into question the fairness of the Lake and Peninsula Borough's 2010 election and the impartiality of these newly elected assembly members. Bush Planes flew the candidates throughout the borough, a borough where many communities can only be accessed by plane. And this travel allowed the candidates to promote themselves to individual voters face-to-face.

Moreover, the fine both punishes Bush Planes and serves as a deterrent to other corporations that might consider flouting the prohibition on direct contribution. Absent a substantial fine, a corporation may be tempted to provide illegal direct contributions and write off those contributions and any associated fine as a cost of doing business. A substantial fine sends the signal that the Commission treats these violations seriously. Given these concerns, the fine was not obviously unreasonable and thus not unconstitutionally excessive.

---

[47] Ch. 48, § 1(a)(1), (a)(3), (b), SLA 1996.

### 2. Punitive damages case law is either irrelevant or supports the fine.

Bush Planes argues that we should look to punitive damages case law for guidance and that the fine imposed here would be impermissible if this were a punitive damages case. But our prior discussions of punitive damages case law does not support Bush Planes' argument.

The federal due process analysis that guides the determination of when punitive damages are unconstitutional flows from the concept that the tortfeasor should have some "notice of the magnitude of the sanction that a state might employ."[48] Here, Bush Planes had notice of the magnitude of the sanction the State might employ because the sanction the Commission employed was the maximum *statutory* penalty.[49]

And we have never endorsed a particular "fixed ratio, or range of ratios, between punitive and compensatory damages" under Alaska law.[50] We have approved

---

[48] *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1067 (Alaska 2005) (citing *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).

[49] *Hutton v. Realty Execs., Inc.*, 14 P.3d 977, 980 (Alaska 2000) ("As a general rule, people are presumed to know the law.").

[50] *Casciola*, 120 P.3d at 1064 (citing *Fyffe v. Wright*, 93 P.3d 444, 457 (Alaska 2004)).

previous punitive damages awards with ratios of approximately 26:1,[51] 18:1,[52] and 50:1.[53] The ratio in this case is approximately 20:1. Our case law does not indicate that a 20:1 ratio is inherently impermissible.

Instead of taking a strict mathematical approach, we have considered the seven factors listed in AS 09.17.020(c).[54] These factors involve considerations similar to those the Commission discussed in this case, including the likelihood of harm, the defendant's awareness of the likely harm, the duration of the conduct, the defendant's financial condition, and deterrence.[55]

A review of those factors supports the Commission's imposition of a significant fine. Bush Planes is a sophisticated entity with substantial assets and knowledgeable management. Its actions called into question the fairness of the Lake and Peninsula Borough's 2010 election. A $25,500 fine sends a message that the Commission takes these kinds of violations seriously and helps deter other corporations from engaging in similar misconduct. In sum, the award is not so excessive that it would violate Alaska or federal law regarding punitive damages.

---

[51] *Laidlaw Transit, Inc. v. Crouse ex rel Crouse*, 53 P.3d 1093, 1096-97 (Alaska 2002) (affirming an award of $500,000 in punitive damages and $19,259 in compensatory damages).

[52] *IBEW, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852, 853-55 (Alaska 1999) (affirming an award of $212,500 in punitive damages and compensatory damages of $11,622.05).

[53] *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 161, 174-77 (Alaska 1999) (remitting a $3,000,000 punitive damages award to $500,000 on a compensatory damages award of $10,000).

[54] *Casciola*, 120 P.3d at 1065.

[55] AS 09.17.020(c)(1)-(c)(2), (c)(4), (c)(6)-(c)(7).

**3. The Commission's fine bore a reasonable relationship to Bush Planes' offense.**

Bush Planes also argues that the method the Commission used to calculate the fine bears no reasonable relationship to the offense. Bush Planes contends that the fine served a minimal deterrent and remedial function because for at least the first 90 days after the violations, Bush Planes was unaware, and could not have known, that the Commission's staff was investigating it. Bush Planes also alleges that the Commission's staff purposely waited almost 120 days after they began drafting a complaint in March 2011 before filing it as a way of increasing the penalty.

First, we find no support in the record for Bush Planes' latter assertion. While the record indicates that the Commission's staff may have begun drafting a complaint as early as the end of March 2011, the evidence also indicates that the Commission's staff was continuing to investigate the allegations. Moreover, there are no allegations of bias against the attorney who was involved in drafting the complaint; nor has Bush Planes presented any evidence that suggests a deliberate delay.

Second, Bush Planes' contention that the Commission improperly included days before Bush Planes became aware that the Commission's staff thought Bush Planes had violated the law in calculating the fine is unpersuasive. Bush Planes argues that imposing a fine before it became aware of the staff's concerns "achieves no reasonable deterrent or remedial goal." But there is no requirement that a violator of campaign laws must be made aware that it violated the law before a fine can be imposed. Even if Bush Planes were unaware, a fine calculated based on the time Bush Planes was unaware of the violation still serves a punitive function even if it does not serve a remedial function. And while including the time when Bush Planes was not aware that the Commission's staff believed there was a violation may not have a short-term deterrent effect, it may have a long-term deterrent effect on Bush Planes and other actors that Bush Planes'

argument does not take into account.  Thus, we hold that the fine bore a reasonable relationship to the alleged offense.[56]

C.    **The Superior Court Did Not Abuse Its Discretion When It Denied Bush Planes' Motion To Supplement The Record And Briefing.**

Finally, Bush Planes argues that its due process rights were violated because the Commission and its staff were biased against it.  But the evidence of any potential due process violation is not properly before us because the superior court denied Bush Planes' motion to supplement the record with the materials Bush Planes alleges shows evidence of bias.  Bush Planes claims that the superior court abused its discretion in denying the motion, but we disagree.[57]

First, the motion was not timely.  Briefing on Bush Planes' appeal to the superior court ended in early November 2012.  Bush Planes then learned of and appears to have obtained much of the information it sought to add to the superior court record by the end of January 2013.  Despite that, Bush Planes waited approximately three months until it moved to supplement the record shortly before oral argument.

---

[56]    Our approval of the fine imposed in this case should not be considered blanket approval of the statutory penalty.  While we hold the total fine imposed here was not excessive, we can envision a case where the application of the $50 per day maximum fine would be unconstitutionally excessive.  The determination is fact-intensive and an individualized assessment of the penalty is the correct analysis.

[57]    We review the denial of a motion to supplement the record for abuse of discretion. *Southwest Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Alaska Marine Highway Sys.*, 941 P.2d 166, 172 (Alaska 1997).  We may affirm the superior court's denial on any basis supported by the record. *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008).

Second, it does not appear that the evidence Bush Planes wanted to submit would have changed the outcome of the liability determination.[58] Whether Bush Planes violated Alaska's campaign finance laws ultimately depended on the proper determination of "commercially reasonable rate," and we have reviewed that issue using a standard that not only granted no deference to the Commission's interpretation but actually favored Bush Planes. Thus, any bias that the Commission or its staff may have had against Bush Planes would have had no effect on the liability issue.

Finally, the State persuasively argues that the evidence Bush Planes sought to introduce was irrelevant given the context and the timing of the case. We note that the majority of the material Bush Planes wanted to introduce alleged that staff members Anderson and Dauphinais — and to a lesser extent Commission Chair Hickerson — were biased against Bush Planes. The allegations against the other Commissioners — all of whom concurred in the liability, fine, and costs and fees decisions — were based mainly on an affidavit from a former staff member. That staff member recalled specific interactions with Anderson, Dauphinais, and Hickerson that caused him to believe those three were biased against Gillam and his companies. The staff member's affadavit complained that the Commission had rejected an advisory opinion he drafted "without a legal basis and primarily because of who requested it," but Bush Planes never provided any foundation for that allegation. The same lack of specificity significantly weakens the staff member's claim that it would be "impossible for [Gillam] . . . to get a fair shake from . . . certain members of the Commission."[59] Overall, there was little, if any, reliable

---

[58]    *Southwest Marine, Inc.*, 941 P.2d at 179-80.

[59]    We recognize the parties continue to litigate issues of bias in other proceedings. *See, e.g.*, *RBG Bush Planes LLC, et al. v. Alaska Pub. Offices Comm'n*, Case No. 3AN-14-06497 CI. Our discussion here should in no way be interpreted as
(continued...)

evidence that the other members of the Commission were biased individually or even that the alleged bias of Hickenson or the staff members affected the proceeding. Furthermore, Dauphinais's allegedly biased statement was made nine months after the administrative decision was issued, suggesting that the allegations have little weight given the timing of this case.

Therefore, we hold that the superior court did not abuse its discretion when it denied Bush Planes' motion to supplement the record. Given the delay in filing the motion to supplement, the standard of review we applied to the liability determination, and the lack of specificity regarding the allegations against the Commissioners, the superior court's decision was not manifestly unreasonable.

## V.   CONCLUSION

For the reasons stated above, we AFFIRM the superior court's decision to affirm the Commission's determination that Bush Planes made illegal corporate contributions to candidates for elected office, AFFIRM the fine the Commission imposed, and AFFIRM the superior court's denial of Bush Planes' motion to supplement the record.

---

[59](...continued)
expressing an opinion regarding the evidence in those other matters.